UNITED MUTUAL FIRE INSURANCE COMPANY, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 27844.)

Court of Claims, December 15, 1945.

*Frank C. Roberts* for claimant.

*Nathaniel L. Goldstein, Attorney-General* (*Frank M. Noonan* of counsel), for defendant.

RYAN, J. Claimant sues to recover $350, the amount disbursed by it in satisfaction of a claim of its assured for damages to his automobile truck upon which claimant had issued a collision policy. The damages to the truck occurred when a bridge over Burnt Ship Creek in Buckhorn Island State Park collapsed. The State of New York is charged with negligence

in failing to maintain the bridge in a proper state of repair, in failing to inspect the bridge properly and in failing to post warning signs indicating the weight of load the bridge could safely carry or indicating that it was defective.

The insured's motor vehicle was a Ford one and one-half ton dump truck weighing, unloaded, 6,950 pounds. Although the driver testified that on the morning of the accident his load consisted of one batch of black top weighing two tons for which he had paid $9 either by check or in cash, the records of Bituminous Products Company, the vendor of the black top, disclose that on the date in question that company delivered and the driver signed for two separate loads of black top each weighing 14,000 pounds for each of which the company was paid by check in the amount of $33.25. The written record outweighs the recollection of the witness and we find that the truck with its load weighed 20,950 pounds or more than ten tons.

The load was intended for delivery not in the State park but to a private property owner whose lands were located outside the State park and could be reached by public highways without traversing the State park and without crossing the bridge. Two other routes were available to the driver, one of them, at least, shorter than the route through and across the State park. The driver had used the other routes at times. He had also driven through the park and over the bridge two or three times. His approach from Cheektowaga, where he obtained the material, to the point of delivery was by the Grand Island Connecting Boulevard, a State highway. He could have turned off on to town or county roads which intersected that highway. He testified that he missed one of them. He turned on to a gravel and slag road in the park and thereby approached the bridge. He testified that he did not know that he was in an area where commercial vehicles were restricted, that he was "over there a few times and no one seemed to stop me"; that "on the road that I took there weren't any such signs".

However, the preponderance of evidence is that one sign was posted on the park road approaching the bridge and in a position where the driver must have passed it. This sign was a disc twenty-two inches in diameter, mounted on a two and one-half inch pipe set in concrete and bearing the words "No Commercial Vehicles" in letters four inches high. It was located about 900 feet from the entrance to the park and, according to one witness, at least 1,200 feet from the bridge.

Scaling the map, Exhibit A, indicates that the sign was about 1,800 to 2,000 feet from the bridge.

The structure was a rustic timber bridge built in 1936. It was fifty feet long in two spans. A timber crib set in the center of the creek supported the ends of the abutting span timbers. There was a timber rock-filled abutment on each side of the creek. The bridge was planned for passenger traffic and very light truck traffic. It was designed and built according to good engineering practice. New, it would support a fifteen-ton load which, according to engineering testimony, would be distributed one third on the front wheels and two thirds on the rear wheels of a moving vehicle. The park authorities inspected the bridge about four months before the accident. The park engineer testified " There was nothing to indicate that the bridge was in an unsound condition so as to prohibit light passenger traffic. The timber did show some slight deterioration. * * * It was just a surface deterioration.'' This condition did not '' indicate that the bridge was in an unsafe and unsound condition.'' At no time were any warning signs posted indicating the safe load limit for the bridge. An examination of the bridge after its collapse disclosed that '' the 12 by 12 rough hewed timber beams in the bridge had failed in the bending at the middle, had failed in the horizontal shears throughout the length and had also * * * subsequent to the two failures mentioned * * * failed at the point of support.'' Observation of the timbers disclosed a '' dry rot condition ''; '' the wood was disintegrated ''. This was on the inside and would not have been disclosed by a casual inspection of the outside.

If we were here concerned with a bridge in a public highway, the evidence above outlined would justify a finding of negligence on the part of the State of New York in its failure properly to inspect, its failure to give warning of the safe load limit or its failure to repair or barricade the bridge. (*Jackson* v. *State of New York,* 261 N. Y. 134.) But article IX of the Highway Law is not applicable to bridges in the State parks. However, the test of reasonable care must be applied in the administration and operation of the State parks. And the State of New York may be liable to its invitees therein for failure to use reasonable care. (*Kittle* v. *State of New York,* 272 N. Y. 420.)

Was the driver of the truck in this case an invitee and what was the duty which the State owed him? The sign which we have above described was one of four similar signs placed

at or near the various entrances to the park. These signs were posted pursuant to the traffic regulations adopted by the Niagara Frontier State Park Commission as part of its ordinances and in effect at the time and for several years prior to the accident. The adoption of these ordinances is authorized by subdivision 3 of section 682 of the Conservation Law which makes violation of them a misdemeanor. Section 3 of article VI of State Parkway General Ordinance No. 1 reads as follows: " Section 3. *Commercial Vehicles.* No person shall drive or operate within any park any omnibus adapted for more than seven passengers, or any vehicle constructed  *  *  *  or adapted for or engaged in the carrying of any merchandise *  *  *."

Although the driver testified that he did not see the sign marked " No Commercial Vehicles " and although he had previously driven his employer's truck through the park and no one had stopped him, we believe he was, nevertheless, chargeable with the knowledge that in operating the vehicle through the park he was violating the park rules. He was sufficiently familiar with the location to know that he was not upon a public highway. He was using the vehicle for commercial purposes, viz., the delivery of merchandise in the form of construction materials. Granting that he had no knowledge of any deterioration in the bridge timbers and no warning as to the safe-load limit of the bridge at the same time he had no necessity for using the bridge. When he entered the park he was not an invitee but a trespasser. When he undertook to cross the bridge with whatever load the vehicle carried, great or small, the responsibility was his. With a lighter load he might have crossed safely. Had the bridge collapsed with a lighter load, likewise commercial, the responsibility would still be the driver's. There was no invitation to this man to enter the park or to cross the bridge with the truck he was operating. There was no obligation upon the State Park Commission to assure the truck safe passage over the bridge. We may not speculate on what might have happened to a passenger vehicle which some visitor to the park might have driven on to the bridge nor test the conduct of the Park Commissioner's agents and employees by any assumed happening. The question to be determined is whether they were negligent in respect to the particular accident out of which this suit arises. We decide that they were not. Neither the driver nor his employer could recover. Therefore the claim of this corporation must be dismissed. Decision accordingly.